IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
OKLAHOMA

| | | |
|---|---|---|
| (1) DIPTIBEN MISTRY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. CIV-12-34-F |
| | ) | |
| (1) CHANDRAKANT UDWADIA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| (2) NILAM UDWADIA, | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

### PRELIMINARY STATEMENT

Ms. Diptiben Mistry (hereinafter "Plaintiff" or "Mistry") brings this action for forced labor and human trafficking to recover for damages inflicted by Defendants Chandrakant Udwadia and Nilam Udwadia (collectively, "Defendants"). By engaging in modern-day slavery, Defendants committed abhorrent acts condemned in all civilized countries. Having survived these acts, Mistry seeks redress for Defendants' failure to compensate her forced labor, her intense physical and psychological pain and suffering, and other direct consequences of Defendants' acts which deprived Mistry of her basic human dignity.

Defendants fraudulently induced Mistry to marry their son, Himansu Udwadia, misrepresenting the terms of marriage. Defendants then transported Mistry from India to their

home in the United States.  Using psychological coercion, physical violence, and threats of divorce and return to India as a stigmatized woman, Defendants forced Mistry to provide daily domestic labor for them, in violation of international, federal, and state laws.

During the period that Mistry was forced to work for Defendants, Defendants never paid Mistry.  Defendants held Mistry as a virtual prisoner in their residence, restricting her access to food, depriving her of medical care, subjecting her to verbal, psychological, and physical abuse, and keeping her under constant surveillance.  Defendants controlled every aspect of Mistry's life, including when she ate, slept, and showered, stripping her of any means of independence, subjecting her to almost constant surveillance, and dictating the minutiae of her daily life.

Indian culture dictates that young women respect and obey their elder relatives.  Upon marriage, a woman is expected to obey her husband and his family members.  Divorce is considered extremely shameful in Indian society, particularly for women, and a divorced woman, as well as her entire family, may be considered permanently stigmatized in the eyes of their community.  Defendants effectively leveraged these cultural practices to coerce Mistry into providing domestic labor.

Defendants knowingly and willfully rendered Mistry isolated, helpless, and utterly dependent upon them in order to constructively imprison her.  Defendants forced her to work long hours on little sleep and with little to no human contact outside of themselves.  They prohibited Mistry from speaking privately with her own family in India.  They deprived her of any money or knowledge of how to arrange for transportation.  Defendants controlled every aspect of her life, down to the smallest detail, creating an atmosphere of complete control and effectively ensuring that Mistry could not escape.  Defendants, through their acts and omissions, actively contributed to and promoted Mistry's helplessness in order to maintain complete control

over her and in doing so, created a coercive environment far more effective than mere locked doors or physical threats.

By fraudulently luring Mistry to the United States under the guise of marriage to their son and subjecting Mistry to forced labor, Defendants committed human trafficking.  Mistry seeks damages and restitution for unpaid wages, damages for trafficking her into the United States under false pretenses, and damages for breach of contract.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

2.  This Court has federal question jurisdiction pursuant to 18 U.S.C. § 1595(a), this action arising under the Trafficking Victims Protection Act (TVPA), and 28 U.S.C. § 1350, this action arising under the Alien Tort Statute.

3.  This Court has supplemental jurisdiction over the related state law claim for human trafficking asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367.  Supplemental jurisdiction over that claim is appropriate because it arises from the same common nucleus of operative facts from which the federal claims arise.

4.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Elk City, Oklahoma, in the Western District of Oklahoma.

## PARTIES

5.  Mistry is a 24 year old citizen of India.  At the time of the events giving rise to this complaint, Mistry was residing in the United States.  Mistry worked for Defendants from approximately April 3, 2007 until March 22, 2008, where she was effectively imprisoned

in Defendants' home in Elk City, Oklahoma, and in Defendants' eldest son's home in Douglasville, Georgia.

6. At all times relevant hereto, Defendant Chandrakant Udwadia ("Chandrakant") resided with his wife at 100 Sunset Circle, Elk City, Oklahoma, 73644.  At all times relevant hereto, Defendant Nilam Udwadia ("Nilam") resided with her husband at 100 Sunset Circle, Elk City, Oklahoma, 73644.

## FACTUAL ALLEGATIONS

### Mistry's Marriage to Himansu Udwadia

7. Mistry and her family met Defendants and their two sons, Himansu and Prasad, in Navsari, Gujarat, India on January 10, 2007.

8. At the time, the Udwadia family was already living in the United States, having previously lived in Canada, where Himansu was born.

9. After meeting for approximately thirty minutes at the home of Mistry's relatives in Navsari, India, Chandrakant and Mistry's father, Suresh Mistry ("Suresh"), agreed that Mistry and Himansu would become engaged.[1]

10. Before agreeing to the marriage, Mistry and/or Suresh informed Chandrakant that Mistry was in the process of obtaining her bachelor's degree in hotel and tourism management. Mistry and her father both insisted that Mistry would be allowed to complete her remaining year in the program to obtain her degree.

11. On January 10, 2007, Chandrakant and Suresh entered into a marriage agreement.

---

[1] Arranged marriages, where the potential spouses' families play a leading role in the arrangement, are common in India.  Differing from forced marriages, arranged marriages require consent from both individuals.

12. Chandrakant agreed that Mistry would be permitted to finish her education in India, and he stated that they were not in a hurry to return to the United States.

13. Chandrakant informed Mistry and her family that Himansu was already employed in the United States, a statement that proved to be false.

14. The engagement ceremony took place on January 24, 2007 in Gadat, Gujarat, India.

15. Mistry and Himansu were married on February 3, 2007 in India. The marriage was registered with the Registrar of Marriage on the same day.

16. Newlywed Indian couples often travel to visit relatives following their honeymoon, and usually they travel unaccompanied. However, following the week-long honeymoon, Defendants insisted that they travel with Himansu and Dipti to visit relatives in India.

17. Defendants cancelled Mistry's cell phone subscription after the wedding – one of their first acts of limiting Mistry's ability to communicate with her family.

18. After the wedding, the honeymoon, and the travel around India to visit relatives, Mistry's exams at school were starting, but Chandrakant would not permit her to return to school. Instead, Chandrakant told Mistry that she needed to return to the United States with them immediately and would not be permitted to finish her education in India, as contracted for in her marriage agreement.

19. On March 8, 2007, while still in India, Mistry had a visa interview at the U.S. embassy and obtained an H-4 visa. However, Mistry realized that the visa process had been initiated long before the Udwadia family had met her and soon discovered that her visa had been obtained fraudulently.

20. Upon information and belief, Defendants were looking for any "bride" that could fulfill a domestic servant role in their household.

## Mistry Moves to the United States, Where Her Enslavement Begins

21.   From April 3, 2007 to May 17, 2007, Himansu lived with Mistry and Defendants in the Defendants' Elk City, Oklahoma home.

22.   Mistry arrived in the United States on April 3, 2007 and accompanied the Udwadias to their home in Elk City, Oklahoma.

23.   Himansu obtained an H-1B visa for an occupation that requires theoretical or technical expertise in a specialized field.  Spouses of H-1B visa holders can seek admission in the H-4 nonimmigrant classification but cannot be employed in the United States.

24.   Despite Defendants' claims that Himansu was employed in the United States, Mistry discovered upon arriving in the United States that Himansu was not in fact employed, rendering Mistry's H-4 visa application fraudulent.

25.   Although Himansu was not employed in the United States at the time that he received his H-1B visa, he told embassy officials that he was working for a company called PN-NTA Inc., DBA Country Inn & Suites.

26.   Upon information and belief, Chandrakant's friend owned the company, and Chandrakant paid his friend to confirm with the U.S. Embassy that Himansu was employed in the United States and to write paychecks for Himansu to provide support for the misrepresentation.

27.   Upon arrival in the United States, Mistry was forced into domestic servitude at the home of Defendants.

28.   The day after Mistry arrived in the United States, Chandrakant took away all of her personal belongings.  Chandrakant confiscated her passport and her jewelry, placing them

in a safe deposit box at his bank.  Chandrakant told Mistry that these actions were necessary because the family traveled often and could not keep those items in the house.

29. After arriving in the United States in April 2007, Defendants planned to visit family in Canada and to have another wedding reception for Himansu and Mistry, but in order to go to Canada, Mistry was required to go to a Canadian embassy in Detroit, MI to obtain a visa.

30. It was at this time that Mistry realized Himansu's U.S. visa had been fraudulently obtained.  After the Canadian immigration officials reviewed Mistry's U.S. visa, based on her husband's employment visa, they contacted Himansu's alleged employer and discovered that Himansu was not employed there.

31. Defendants did not permit Mistry and Himansu to spend time alone together.  Defendants required their younger son, Prasad, to accompany Mistry and Himansu everywhere they went.

32. During this period, Chandrakant would send Prasad to share a bed with Mistry and her husband, Himansu.  Himansu would sleep in the middle with Mistry and Prasad on the sides.  The only time that Mistry and Himansu were permitted to be alone was on their week-long honeymoon.  Otherwise, when Mistry and Himansu would travel, Defendants would get a room with one bed for Mistry, Himansu, and his brother, Prasad, to sleep in together.

### Defendants Subjected Mistry to Forced Labor Through Physical, Verbal, and Emotional Abuse

33. Defendants used physical and verbal abuse, surveillance, and psychologically coercive tactics to exercise complete control over Mistry and to subject her to forced labor.

34. Through their abuse and controlling behavior, Defendants created an environment in which Mistry felt she could never escape.

35. During Mistry's time living with Defendants in Oklahoma, Defendants subjected Mistry to forced labor by requiring her to perform all domestic work while closely monitored by Chandrakant.  Chandrakant did not allow Mistry to take breaks from her daily household chores except to study for her bookkeeping course and a bank teller certificate, which he forced her to obtain so that she could help him with his accounting business.  If at any point Mistry chose not to follow Chandrakant's orders, she would be subjected to verbal and physical abuse, such as slapping, yelling insults, or throwing items at Mistry.

36. Mistry was responsible for all domestic work in the Defendants' home.  She was expected to work from approximately 5 am to 11 pm each day.

37. Mistry worked for Defendants in their Oklahoma home seven days a week, eighteen hours a day, for eight months, accruing approximately 4320 total hours from April 3, 2007 to October 19, 2007.

38. Each day, Defendants required Mistry to prepare and cook all three meals of the day, as well as tea and snacks.  Everyday, Defendants also required Mistry to wash the dishes, to prepare for prayer by picking flowers and by cleaning the gods' pictures, to sweep and mop the floors, to do laundry, and to take care of the dog.

39. Chandrakant supervised Mistry closely and told her exactly what chores to do, what to cook, and which pots, pans, and utensils to use.

40. Chandrakant constantly critiqued Mistry's work, telling her she was stupid and did not know how to do things correctly.

41. Chandrakant once hit Mistry on the head during prayers because she made a mistake.

42.  Mistry was expected to work everyday, even when she was sick.  Chandrakant would claim that she was trying to get attention if she told him she did not feel well.

43.  Nilam would report to Chandrakant what Mistry did throughout the day.  She would report even the smallest detail, including when Mistry had a snack.

44.  On May 17, 2007, Himansu moved to Douglasville, Georgia.  Though Himansu wanted to bring Mistry with him, Chandrakant would not permit it.

45.  From May 17, 2007 to October 19, 2007, Defendants kept Mistry and Himansu apart.

*Mistry Felt Like She Was Under Defendants' Complete Control*

46.  Within the first or second week of marriage, Defendants began to verbally abuse Mistry.  The verbal abuse by Defendants continued for the duration of Mistry's marriage to Himansu.

47.  Nilam supported her husband's treatment of Mistry.  She was often present when Chandrakant became verbally abusive with Mistry and would frequently begin yelling at Mistry herself.

48.  Chandrakant would tell Mistry that she was "the dumbest person in the world."  Chandrakant would insult Mistry's family, telling Mistry that her father was a "useless person" who had produced a "useless daughter."

49.  Defendants would tell Mistry that she did not know how to properly walk, talk, or eat.

50.  Defendants did not allow Mistry any privacy.  Whenever she went into her bedroom, Defendants would enter unannounced at any time.  Defendants forbade her from locking her bedroom door.

51.  Upon information and belief, Chandrakant placed cameras in Mistry's bedroom and the bathroom to actively observe Mistry even in her most private moments.

52.  Mistry suspected Chandrakant was watching her in the bathroom because he once commented to Mistry that she needed to use more soap in the shower.

53.  Chandrakant also told Mistry that she needed to have a bowel movement after every meal, telling her that she must actually do it and not just sit on the toilet.

54.  A security alarm was set each night, and if any bedroom door was opened, the alarm would sound unless the code was entered in one of three control panels throughout the house.  The primary control panel was in Defendants' bedroom, and it would display a message if anyone turned the alarm off from another room in the house.

55.  Defendants set up an electronic door chime system on all of the doors leading outside.  If anyone entered or exited the house a chime would sound.

56.  Defendants also dictated every detail about Mistry's appearance.  Mistry was required to wear only traditional Indian clothes.  Defendants went shopping with Mistry and selected clothes for her.  Chandrakant applied Mistry's make-up and groomed her eyebrows. Chandrakant would take Mistry to a hairdresser and tell the hairdresser how to cut and style Mistry's hair.

57.  Defendants also controlled Mistry's diet, dictating what she ate for each meal and severely limiting the amount of food she was allowed to consume.

58.  Defendants prohibited Mistry from developing personal relationships outside of the family.  Defendants told Mistry not to talk to anyone and she was not permitted to leave the house unaccompanied.

59.  Mistry lacked confidence in her ability to function outside of the house, even if she were permitted to leave alone, due to the complete control and constant barrage of verbal abuse that she suffered at the hands of Defendants.

60. In late April 2007, the Udwadia family and Mistry went to Cleveland to visit a friend of Himansu, and Mistry spoke to the friend's wife.  Defendants overheard the conversation and yelled at her.  Defendants told her later not to talk to anyone and to just say, "My Daddy doesn't like it.  I can't talk."

61. Chandrakant cancelled Mistry's email account, and Mistry was not allowed to email her family.

62. Defendants did not permit Mistry to call her family.  When her family called her at Defendants' home, Mistry was required to use the speaker phone; Chandrakant would listen, and as Mistry's parents asked her questions, he would write down what she should say in response.

63. Whenever Himansu called from Georgia, Defendants talked to Himansu first and then allowed Mistry to speak with him while they listened.

64. Chandrakant would ask Mistry if she was capable of keeping Himansu happy in bed and ask how her sexual relations with Himansu were.

65. When Defendants verbally abused Mistry, they told her not to tell Himansu.  However, Mistry did eventually tell Himansu about Defendants' threats to send her back to India. Himansu did nothing in response because he was afraid Chandrakant would abandon him, and he was unable to live financially independently from his father.

*Mistry Feared that Defendants Would Harm Her if She Disobeyed Them*

66. In addition to controlling Mistry through psychological manipulation, Defendants used specific threats of serious harm to frighten Mistry into working for them.

67. Defendants continually threatened Mistry with divorce throughout her entire marriage to Himansu in response to anything she did that displeased them.

68. Defendants used the societal stigma in India associated with divorce to their advantage and routinely threatened to have Himansu divorce Mistry and send her back to India if she did not do what she was told.

69. Chandrakant told Mistry that if she was divorced, her own father would not accept her into his home, and no one would marry her.  Chandrakant also said that her brother would have difficulty getting married and that her whole family would be affected.

70. Mistry believed Defendants' threats and felt that she had no choice but to do what Defendants told her.  At the time, Mistry believed that if she were divorced, she could not return to her parents' house since her family would be shamed.

71. Since Himansu did everything his parents told him to do, Mistry took Defendants' threats of divorce seriously.

72. Due to the constant threats, coupled with coercion and verbal and physical abuse, Mistry was afraid of Chandrakant and of what he might do if she did not follow his orders.

73. At all times relevant thereto, Chandrakant, in all his actions taken in contracting for marriage, breaching the contract and using the marriage as a sham for forced labor, and forcing Mistry into domestic servitude, acted in concert with Nilam.  Nilam also approved and/or endorsed all of the relevant conduct undertaken by her husband.  Nilam was complicit in the conduct undertaken by Chandrakant and benefitted from Mistry's forced labor.

### *Defendants Also Subjected Mistry to Deprivation of Food and Medical Care and to Sexual Abuse*

74. In addition to forced labor, Mistry suffered harm at Defendants' hands in the form of deprivation of food, deprivation of medical care, and sexual assault.

75. One night, Chandrakant came into Mistry's room around 1 am, locking the door behind him. Chandrakant began touching her. Mistry got up from the bed, and Chandrakant chased her around the room. Mistry became frightened and screamed, so Chandrakant told Mistry to go outside, leaving her standing in the cold for fifteen to twenty minutes. When Chandrakant allowed Mistry back inside, he told her not to tell anyone what had transpired in the bedroom. Otherwise, Chandrakant told her, he would send Mistry back to India.

76. At all times while married to Himansu, Mistry's access to food was restricted by Defendants. For breakfast, she was allowed one cup of cereal and milk. For lunch, Mistry was permitted one chapati (unleavened flatbread), vegetables, and one can of V-8 juice. For dinner, Mistry could have one cup of fruit.

77. Defendants decided what Mistry was permitted to eat when they went to restaurants. The one time Mistry dared to order her own dish at a restaurant, Chandrakant became angry with her. He made it clear that only Defendants could order for her, and she was not allowed to eat all of the meal when it came.

78. When Mistry arrived in the United States, she weighed 121 pounds at five feet, two inches. By the time she was sent back to India, she had lost twenty-six pounds, weighing only ninety-five pounds.

79. Defendants repeatedly denied Mistry medical care.

80. Whenever Mistry was sick, Chandrakant claimed that he had the "healing touch" and would touch Mistry's face and stomach, which made her uncomfortable.

81. When the Defendants did take Mistry to receive medical care, Chandrakant insisted on being present for any interaction that Mistry had with doctors. For instance, when

Chandrakant took Mistry to a doctor's appointment, the doctor asked Chandrakant to leave the room for privacy.  Chandrakant refused, forcing Mistry to answer personal questions in front of him.

82.   Once, Mistry felt severe pain from a wisdom tooth, and Chandrakant refused for several days to permit Mistry to go to the dentist.  Instead, Chandrakant touched Mistry's cheeks, three to four times a day, fifteen minutes in length each time, claiming that he was giving Mistry the "healing touch."

83.   After about a week, Chandrakant finally permitted Mistry to go to the dentist, but he would not allow Mistry and Himansu to go alone; Chandrakant insisted on coming to the appointment.

84.   At the appointment, Chandrakant told the dentist to pull the tooth even though the desired numbness had not yet been achieved, stating that Mistry was faking the pain.

### Defendants' Abuse and Control Continued When Mistry Moved to Georgia

85.   On October 19, 2007, Defendants permitted Mistry to move to Douglasville, Georgia to live with Himansu.

86.   Upon information and belief, Defendants permitted Mistry to move to Douglasville, Georgia after Himansu became embarrassed over comments from Himansu's boss, who had been asking Himansu why his wife was not living with him.  Himansu told Chandrakant about these questions.

87.   At this time, Chandrakant gave Mistry's passport to Himansu, who put it in a deposit box at his bank per his father's orders.  While Mistry was living in Douglasville, Georgia with Himansu, Defendants expected Mistry to perform the same housework in Georgia and to study for an accounting course they forced her to take when she was not performing

domestic work.  Chandrakant repeatedly told Mistry that she needed to take the course so that she would eventually be able to assist him with his accounting business.

*Mistry Continued to Feel Controlled by Defendants*

88. Defendants continued to use verbal abuse, surveillance, and strict rules to manipulate Mistry into constantly working while in Georgia.

89. Despite the distance between Mistry and Defendants, Defendants kept Mistry under constant surveillance through the use of a web camera.

90. Each day when Himansu left the house, Mistry had to turn on the laptop, log into Himansu's Skype account, and turn on the web camera.

91. Mistry was required to take the web camera with her everywhere she went in the house. Defendants required Mistry to remain logged into the Skype account the entire day until Himansu returned home.  If Mistry failed to turn on the web camera, turned off the web camera, or left the room without taking the web camera with her, Chandrakant would call and yell at her.

92. In addition to watching Mistry on the web camera, Defendants expected Mistry to call them throughout the day to update them on her activities.

93. If Himansu and Mistry left the house, the house calls would be forwarded to Himansu's cell phone.

94. Himansu would also report back to Chandrakant everything that Mistry did.

95. Defendants used all of this monitoring to ensure that Mistry was constantly performing household labor or studying for the courses Chandrakant forced her to complete so she could eventually work in his accounting business.

96.   Mistry's diet was still restricted.  Himansu would tell Mistry what she was allowed to eat for dinner and how much she could eat.

97.   Every Friday, Mistry and Himansu would go shopping to buy what they needed for the pre-prepared menus that Nilam sent them.  Mistry and Himansu were not permitted to buy items that were not on the list.

98.   One time when they were out shopping, Himansu bought Mistry some cotton candy.  Mistry kept the container and used it for storage.  When Defendants came to visit and saw the container, they became angry and told Mistry that cotton candy had not been on the list of food to buy.

99.   Chandrakant's control extended to Mistry and Himansu's family plans.  Himansu told Mistry that they would have a baby when Chandrakant told them to.

100.  Chandrakant also began telling Mistry to look for a job so that she could earn money for Defendants and/or Himansu.  Chandrakant told Mistry she could use Nilam's social security number as her own to get a job.  However, Himansu warned Chandrakant that it was not a good idea because he feared it would jeopardize his H-1B status.

101.  During Chandrakant's January 2008 trip to Georgia to visit Mistry and Himansu, Chandrakant and Mistry went to a Dairy Queen to ask for a job for Mistry.  Chandrakant spoke to the manager, and the manager gave Mistry a job.

102.  Mistry did not have a work permit and did not want to work without authorization; however, Chandrakant forced her to work unlawfully.

103.  Mistry worked at the Dairy Queen part-time in February 2008.

104.  Mistry was paid $6.00 per hour in cash for her work at Dairy Queen.  Mistry earned between $100 and $200 total**.**

105. Mistry would give the cash to Himansu who would consult with Chandrakant about its use because Chandrakant oversaw all of their finances.

106. Mistry was never permitted to keep any of the money she earned at Dairy Queen.

107. Mistry was required to tell Defendants her work schedule and had to call Defendants when she left the house and when she returned from work.  If she failed to do so, Defendants would call her and verbally abuse her.

108. Mistry rarely left the house unaccompanied.  Occasionally Mistry would go to the laundry room facilities in the apartment complex or to work at Dairy Queen alone; however, the majority of the time Himansu would go with her.

109. Defendants continued to deny Mistry access to medical care.

110. Mistry was bitten by a spider, which led to a fever, vomiting, dizziness, and a large, painful red rash.

111. Himansu called his father and asked if he could take Mistry to the doctor.  However, Chandrakant did not permit Himansu to take Mistry to a doctor because of the cost.

112. Instead, Chandrakant asked Himansu to send a photo of the rash.  By that point, the rash had spread so far that taking a picture of it would include some of Mistry's private areas. Knowing this issue, Chandrakant still insisted on seeing a photo of the rash, and Himansu took and sent the photo as Chandrakant requested.

113. Without medical care, the rash turned into a blister and continuously bled, making it difficult for Mistry to sit and to do simple day-to-day tasks for two weeks.

114. The next time Chandrakant came to visit, he touched Mistry's stomach twice a day for a week, claiming that he was healing her wounds.

115. Due to the lack of medical care, Mistry now has a permanent scar on her stomach from the spider bite.

*Mistry Continued to Fear that Defendants Would Harm Her*

116. Despite the distance between them, Mistry still feared Defendants and believed she would be harmed or divorced if she failed to follow their orders.

117. Chandrakant became increasingly violent toward Mistry during visits to Himansu's home whenever he felt Mistry had disobeyed.

118. Chandrakant also encouraged Himansu to use violence against Mistry.

119. During the Defendants' January 2008 visit to Georgia, Chandrakant told Himansu to throw a plate at Mistry's head and "let her bleed" if her cooking was bad.

120. When Defendants came to visit Mistry and Himansu in Georgia in March 2008, Nilam noticed that a glass was missing from among Mistry and Himansu's dishes.  Nilam became upset, and Mistry explained that a glass had broken and that Himansu had told her to throw it away.

121. Chandrakant told Mistry that everything in the house was theirs and that Mistry and Himansu had not purchased anything in the home on their own.  Chandrakant asked Mistry why they had not obtained permission from him before throwing it away.  Then, Nilam saw that there was only half a jar of Indian beans in the kitchen and questioned Mistry why there were not more.  As Mistry tried to explain that Himansu had not been able to take her to the grocery store yet that week, Chandrakant told Mistry not to blame everything on Himansu and that as the wife, she was responsible to do the shopping. Chandrakant then threw a glass jar at Mistry.  Mistry avoided the jar by ducking.

122. Later during that same visit, Chandrakant became mad at Mistry for doing the dishes while Nilam was speaking to her; Chandrakant told her to pay attention and then shoved the dish rack at her, hitting Mistry's hand.

123. As in Oklahoma, Defendants continued to constantly threaten Mistry with divorce while Mistry lived with Himansu in Georgia. Mistry understood these threats as genuine and certain to occur whenever Chandrakant decided Himansu should divorce Mistry.

124. During Defendants' March 2008 visit to Georgia and in Mistry's presence, Chandrakant told Himansu to divorce Mistry. Chandrakant gave him two options: either Himansu could stay with Mistry and have no relationship with Defendants, or Himansu could divorce Mistry and have Defendants' support. Himansu resisted his father repeatedly and stated he did not wish to divorce his wife.

125. Chandrakant then told Himansu that they would just send Mistry back to India to finish her studies. Chandrakant promised both Mistry and Himansu that Chandrakant would bring Mistry back to the United States after she completed her studies.

126. Upon information and belief, Himansu was unaware that Chandrakant intended to initiate divorce proceedings after Mistry was sent back to India.

127. Upon information and belief, Chandrakant made the decision for Himansu to divorce Mistry. Himansu had previously told Mistry that he would never sign divorce papers.

**Defendants Lied to Mistry to Compel Her Return to India in Order to Initiate a Divorce**

128. Defendants coerced Mistry to return to India on March 22, 2008 on the pretense that she needed to return temporarily to finish her studies.

129. Three or four days after Mistry returned to India, Chandrakant called Mistry and informed her that Himansu was divorcing her.

130.   Chandrakant told Mistry that there was nothing she could do about it and that he would

spend all his money in order to ruin her life.

131.   Mistry requested to speak with Himansu, but he would not speak to her without

Chandrakant also on the phone.  Himansu told Mistry during the call that Chandrakant

had "explained everything to him."  Chandrakant then told Himansu to hang up the

phone.

132.   Mistry decided to return to the United States in the hopes of talking to Himansu directly

to determine if his parents were forcing him to divorce her.  Mistry was deeply concerned

about the stigma she would face as a divorced woman in India and was willing to remain

married to Himansu if he would agree to live independently from his parents and protect

her from them.

133.   Mistry returned to the United States on April 17, 2008.  When she attempted to contact

Himansu, he refused to speak to her.

134.   The divorce was published in Douglasville, GA on August 1, 2008.

135.   When Mistry became aware that Himansu had officially filed for divorce, she was afraid

to respond to the summons because she did not want Defendants to be able to find and

hurt her.

136.   A final judgment was entered by default on October 20, 2008.  Mistry has never received

any marital property, nor has she received the belongings Chandrakant confiscated from

her when she originally arrived in the United States.

**Mistry No Longer has Contact with Defendants, But Continues to Suffer to This Day**

137.   Mistry suffered and continues to suffer psychological harm as a result of Defendants'

treatment of her.

138. Mistry remains haunted by her past and is still overcome with sadness at times, even in her current workplace.

139. When Mistry first returned to India she was unable to eat or sleep as a result of her fear that Chandrakant would act on his threat to spend all his money ruining her life.

140. Initially, Mistry could not even tell her parents about Defendants' treatment.  It was difficult for Mistry to talk openly to her family when she first returned because for eleven months everything she said to them had been scripted.

141. As a result of her experience with the Udwadia family, Mistry has experienced depression, suffers from anxiety, and has trouble sleeping.  Since Mistry's return to the United States, she has had to seek medical care to recover from her experience with Defendants.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Forced Labor**
**Trafficking Victims Protection Act of 2003 ("TVPA")**
**18 U.S.C. § 1589**

142. Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

143. This claim is brought under 18 U.S.C. § 1595 of the Trafficking Victims Protection Act.

144. Defendants subjected Plaintiff to forced labor in violation of 18 U.S.C. § 1589.

145. Defendants knowingly obtained Plaintiff's labor and services by subjecting Plaintiff to serious harm including physical and psychological violence, in addition to threats of serious harm, including threats of divorce, further violence, and threats of forcible return to India in violation of 18 U.S.C. § 1589(a)(2).

146. By using a fraudulent application to obtain Plaintiff's U.S. visa and by repeatedly threatening Plaintiff with divorce, Defendants obtained Plaintiff's labor and services through abuse and threatened abuse of law and the legal process in violation of 18 U.S.C. § 1589(a)(3).

147. Defendants knowingly obtained Plaintiff's labor and services through the use of a scheme, plan, and pattern intended to cause Plaintiff to believe that if she escaped from Defendants, she or another person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

148. As a result of the above violations, Plaintiff suffered damages.

149. Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorneys' fees.

**<u>Second and Third Claims for Relief</u>**

**Human Trafficking for the Purpose of Forced Labor**

**Trafficking Victims Protection Act of 2003 ("TVPA")**
**18 U.S.C. § 1590**

**Oklahoma Human Trafficking Act**
**21 Okla. Stat. § 748.2**

150. Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

151. This claim is brought under 18 U.S.C. § 1595 of the Trafficking Victims Protection Act and 21 Okla. Stat. § 748.2 of the Oklahoma Human Trafficking Act.

152. Defendants knowingly recruited, obtained, harbored, and transported Plaintiff for the purposes of subjecting her to forced labor in violation of 18 U.S.C. § 1590 and 21 Okla. Stat. § 748(B).

153. Defendants recruited Plaintiff from within India, transported her to and within the United States, and housed her in their own home in Elk City, Oklahoma for the purpose of subjecting her to forced labor.

154. As a result of the above violations, Plaintiff suffered damages.

155. Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorneys' fees.

**Fourth Claim for Relief**

**Involuntary Servitude and Forced Labor in Violation of the Laws of Nations**
**Alien Tort Statute ("ATS")**
**28 U.S.C. § 1350**

156. Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

157. This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

158. Defendants subjected Plaintiff to involuntary servitude and/or forced labor, which are violations of the law of nations including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

159. The Convention Concerning Forced or Compulsory Labor defines forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which said person has not offered himself voluntarily."[2]

160. Defendants engaged in acts including, but not limited to, manipulation of legal documents, psychological coercion, abuse and threatened abuse of the legal process, and

---

[2] Art. 2, May 1, 1932, 39 U.N.T.S. 55.

physical abuse to exact work or service from Plaintiff which Plaintiff had not offered voluntarily.

161.  Aiding and abetting involuntary servitude and forced labor is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. § 1350.

162.  Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

**Fifth Claim for Relief**

**Human Trafficking in Violation of the Laws of Nations**
**Alien Tort Statute ("ATS")**
**28 U.S.C. § 1350**

163.  Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

164.  This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

165.  Defendants engaged in human trafficking, which is a violation of the law of nations including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

166.  The leading international instrument on the subject defines human trafficking as:

> [T]he recruitment, transportation, transfer, harboring, or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving

of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[3]

167. Defendants engaged in acts including, but not limited to, the recruitment, transportation, and harboring of Plaintiff.  These acts were conducted through the use of threats of force, coercion, fraud, deception, and the abuse of power and/or a position of vulnerability.

168. Defendants trafficked Plaintiff for the purposes of obtaining forced labor or services.

169. Aiding and abetting human trafficking is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. § 1350.

170. Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Diptiben Mistry, respectfully prays for judgment against Defendants granting the following relief:

a.    All recoverable compensatory, punitive, and other damages sustained by Plaintiff;

b.    Actual and/or statutory damages for injuries suffered by Plaintiff in the maximum amount permitted by applicable law;

c.    Appropriate equitable relief as may be allowable under applicable law;

d.    Payment of reasonable attorneys' fees, costs, and expenses as may be allowable under applicable law; and

---

[3] The Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Crime, art. 1, Nov. 15, 2003, 55 U.N. GAOR Supp. (No. 49) at 60, U.N. Doc. A/45/49 (Vol. I) (2001) 40 I.L.M. 335.

e.      Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on each and every claim set forth herein.

*S/Amy Sherry Fischer*
Amy Sherry Fischer
Bar Number: 16651
Foliart, Huff, Ottaway & Bottom
201 Robert S. Kerr Avenue, 12th Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 232-4633
Facsimile: (405) 232-3462
E-mail: amyfischer@oklahomacounsel.com

ATTORNEY FOR PLAINTIFF