IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | DIPTIBEN MISTRY, | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | Case No.   CIV-12-34-F |
| vs. | | ) | |
| | | ) | |
| (1) | CHANDRAKANT UDWADIA and, | ) | |
| | | ) | |
| (2) | NILAM UDWADIA, | ) | |
| | | ) | |
| | Defendants. | ) | |

## DEFENDANTS' ANSWER AND COUNTERCLAIM

COME NOW Chandrakant Udwadia ("Chandrakant") and Nilam Udwadia ("Nilam"), husband and wife ( "Defendants"), and for their Answer to Plaintiff Diptiben Mistry's ("Mistry") Complaint, allege and state as follows:

## PRELIMINARY STATEMENT

Simply put, the Plaintiff would have the Court believe that Defendants contrived, schemed and tricked their twenty-four year old son and the Plaintiff into a fraudulent marriage, invited family and friends from around the world to wedding, and paid for the wedding all for the purpose of obtaining what amounts to a domestic slave for their selfish purposes in Elk City, America. However, nothing could be further from the truth. Here are the facts.

This case is really about a young woman's obsession to have more and better at almost any cost.  Mistry, intentionally and maliciously, has twisted the facts in a poorly conceived plan to gain the sympathy of others for the purpose of getting a United States

Visa, wealth, and opportunity at the expense of Chandrakant and Nilam.  Defendants are duel citizens of Canada and India.  They live in the United States as permanent residences.  A simple marriage and divorce has been parlayed by Mistry and others into a far-fetched claimed grand conspiracy to commit international human trafficking and forced labor.

This story began when Himansu, then twenty-four years of age, decided to settle down and start a family using as a model for happiness his own parents.  Himansu's mother, Nilam, was born and raised in Gujarat region of India.  She moved to Canada on June 16, 1980 and later got married on June 28, 1980.  Sometime thereafter, Defendants moved to the United States.  Nilam is a traditional Indian wife who devotes herself to the betterment of her family.

Himansu begins his search for an Indian wife by listing his bio data on several websites including shaadi.com and bharatmatrimonial.com.  Unsatisfied with his online efforts to find someone he connected with, Himansu sought the advice and assistance of his parents.  They said, "Let's go to India."

In December 2006, Himansu, his brother Prasad, and his parents, traveled to Navsari, India.  Upon the Udwadia family's arrival, word quickly spread that a Canadian citizen working in the United States was looking for a bride.  As was the custom, suitors submitted their bio data either by email or in person to Himansu or a family member.  If Himansu was interested he would arrange to meet the woman to see if they were

compatible.  Himansu met approximately fifteen (15) to twenty (20) women over a two-week period.

On January 9, 2007, Suresh, Plaintiff's father, delivered his daughter's bio data to Chandrakant and Himansu.  Suresh needed advance notice if Himansu would meet with Mistry because at the time Mistry was attending college in Rajkot.  Rajkot is a one night journey by bus to Navsari.  Himansu said okay and Mistry took a bus two days later to Navsari to meet with Himansu.

On January 12, 2007, Himansu and Mistry met for approximately thirty minutes at Mistry's uncle's home surrounded by family from both sides.  For some reason, Mistry and Suresh did not want the first date to occur at Suresh's modest home.  The date consisted of Himansu and Mistry enjoying tea or a soft drink and talking with one another.  No decision regarding Himansu and Mistry becoming engaged was made at the first date.  However, Himansu was interested in a second date with Mistry.

Himansu and Mistry meet again that same day.  This meeting lasted much longer than the first.  Himansu and Mistry spoke with one another in privacy.  When the two emerged from the private meeting Himansu and Mistry announced to the families they were ready to proceed with the engagement.  Chandrakant and Nilam did not enter into any marriage agreement with Mistry or her father, Suresh.  The decision to wed is up to the bride and groom, which Mistry admits. (See Complaint, ¶9, footnote 1).

The engagement party followed on January 24, 2007.  All traditional Indian rituals were observed at the engagement party.  Himansu and Mistry married on February 3, 2007.  The wedding was a grand and expensive celebration, attended by 250-275 people (family and friends).  Prior to the wedding, Mistry was given five wedding dresses by Chandrakant and Nilam, which cost about $2,000.00.  Further, as is Indian tradition, the groom's parents are expected to give a gift to the bride.  Nilam and Chandrakant also gave Mistry gold jewelry worth about $4,000.00.  After the wedding, Himansu and Mistry traveled to Goa for a wonderful honeymoon.  After the honeymoon and over a period of time, Himansu and Mistry, at their election, were introduced to additional family members living in Navsari, Udwada, Pardi, and Valsad.

## THE VISA

Contrary to what Mistry alleges, her Visa application process started *after* the wedding of February 3, 2007.  Mistry's father, Suresh, engaged an agent to help with Mistry's Visa application.  The agent paid a USA MRV Visa fee on February 19, 2007.  Mistry completed the Visa application on February 22, 2007 and thereafter had a meeting with the US Embassy officials on March 8, 2007.  Mistry's Visa application was approved shortly thereafter.  Mistry was issued H-4 Visa which allowed her to live in the United States but not work.  The H-1 Visa is given to qualified spouses of a holder of an H-1V work Visa which Himansu had.

Significantly and contrary to Mistry's claims, she failed her second year of college and had no tests to take nor was it ever agreed between Himansu and Mistry that she

would stay in India to finish her education.  Mistry has over two (2) years left to complete her degree due to her failing the second year.

## COMING TO AMERICA

The entire Udwadia family left for the United States on or about April 3, 2007. Mistry could not be more excited to come to the United States.  They settled in Elk City, where Defendants had a home.

A typical day for the Defendants begins with morning prayer at about 6:00 a.m. Then, Chandrakant makes himself tea.  He is very particular about his tea so he makes it himself.   Chandrakant then commutes to work in Oklahoma City.  Nilam goes back to sleep until about 8:00 a.m.  Mistry gets out of bed between 8:30 a.m. to 9:00 a.m. each day.   Nilam, Mistry and Himansu would enjoy tea, cereal, and cookies over light conversation.  From April 3, 2007 to May 15, 2007, Himansu was working from home and shared his income with his wife.  Mistry helped around the house and helped take care of the dog, but no one forced her to do so.

In May 2007, Himansu received a job opportunity working for a C.P.A. in Douglasville, Georgia.   Himansu and Mistry discussed the new job opportunity and agreed it was the right move for them to make even though they would live apart for a period of time.  Himansu moved to Georgia for his new job.  The pay structure was tiered based on his length of employment.  At first, Himansu only made minimum wage.  He

lived with a family friend in Jonesboro, Georgia, and commuted each day to work.  Once financially on his feet, Himansu moved into an apartment and, in November 2007, Mistry joined her husband in Georgia.

It soon became apparent that Himansu and Mistry were not compatible.  Himansu did not know the woman he was married to and, once he got to know her, it was clear they did not get along.  By February 2008, Himansu was spending more time sleeping on the couch.   Finally, in March 2008, Himansu told Mistry he wanted a divorce.  Himansu paid for Mistry's plane ticket back to India and she voluntarily flew home.  The divorce was finalized in October 2008.

## RESPONSE TO MISTRY'S PRELIMINARY STATEMENT

Defendant generally denies the unnumbered allegations contained in Mistry's subheading titled "Preliminary Statement."

## RESPONSE TO NUMBERED ALLEGATIONS

1) Paragraph 1 of Plaintiff's Compliant is denied.

2) Paragraph 2 of Plaintiff's Complaint is denied.

3) Paragraph 3 of Plaintiff's Complaint is denied.

4) Paragraph 4 of Plaintiff's Complaint is admitted.

5) Paragraph 5 is admitted in part.  Mistry is 24 years old and at the time of the events alleged to give rise to this lawsuit, was residing in the United States. However, Mistry did not "work" for Defendants nor was she ever imprisoned.

6)      Paragraph 6 is admitted.

7)      Paragraph 7 is denied.

8)      Paragraph 8 is admitted.

9)      Paragraph 9 is denied.

10)     Paragraph 10 is admitted in part.   Mistry and her father, Suresh, did misrepresent to Chandrakant and Himansu that Mistry was in her final year of college for hotel management.   At no point was it ever discussed that Mistry would stay in India to complete her degree.   In fact, Mistry had failed her previous year in college and would have to retake her courses.

11)     Paragraph 11 is denied.

12)     Paragraph 12 is denied.

13)     Paragraph 13 is admitted in part.   Defendants admit Chandrakant told Mistry and Suresh that Himansu was employed in the United States.   The remaining allegations are denied.

14)     Paragraph 14 is admitted.

15)     Paragraph 15 is admitted.

16)     Paragraph 16 is admitted in part.   After the marriage and honeymoon, Indian couples travel to meet each other's respective families.   However, the parents of the newlyweds are the ones who make the introductions to one another's family. Mistry's family was also present during many of the family visits.   Further, Defendants never insisted upon coming.   If the newlyweds did not want them to come, then Defendants would not have come.

17)     Paragraph 17 is denied.

18)     Paragraph 18 is denied.

19)     Paragraph 19 is admitted in part.  The first sentence of paragraph 19 is admitted.  The remaining allegations are denied.

20)     Paragraph 20 is denied.

21)     Paragraph 21 is admitted.

22)     Paragraph 22 is admitted.

23)     Paragraph 23 is admitted.

24)     Paragraph 24 is admitted in part.  Defendants did claim that Himansu was employed in the United States because he was and continued to be employed.  The remaining allegations are denied.

25)     Paragraph 25 is admitted in part.  Himansu told Embassy officials he was employed in the United States because he was.  The remaining allegations are denied.

26)     Paragraph 26 is denied.

27)     Paragraph 27 is denied.

28)     Paragraph 28 is denied.

29)     Paragraph 29 is admitted in part.  The attempted wedding reception in Canada was the only one.  The remaining allegations are admitted.

30)     Paragraph 30 is denied.

31)     Paragraph 31 is denied.

32)     Paragraph 32 is denied.

33)     Paragraph 33 is denied.

34)   Paragraph 34 is denied.

35)   Paragraph 35 is denied.

36)   Paragraph 36 is denied.

37)   Paragraph 37 is denied

38)   Paragraph 38 is denied.

39)   Paragraph 39 is denied.

40)   Paragraph 40 is denied.

41)   Paragraph 41 is denied.

42)   Paragraph 42 is denied.

43)   Paragraph 43 is denied.

44)   The material allegations of paragraph 44 are denied.

45)   Paragraph 45 is denied.

46)   Paragraph 46 is denied.

47)   Paragraph 47 is denied.

48)   Paragraph 48 is denied.

49)   Paragraph 49 is denied.

50)   Paragraph 50 is denied.

51)   Paragraph 51 is denied.

52)   Paragraph 52 is denied.

53)   Paragraph 53 is denied.

54)   The first sentence of paragraph 54 is admitted.  The remaining allegations in Paragraph 54 are denied.

55)     Paragraph 55 is admitted.

56)     Paragraph 56 is denied.

57)      Paragraph 57 is denied.

58)     Paragraph 58 is denied.

59)     Paragraph 59 is denied.

60)     Paragraph 60 is admitted in part.  Defendants, Himansu, and Mistry did stay in Cleveland, Ohio with a family friend while in route to Canada for the Wedding reception.  The remaining allegations in paragraph 60 are denied.

61)     Paragraph 61 is denied.

62)     Paragraph 62 is denied.

63)     Paragraph 63 is denied.

64)     Paragraph 64 is denied.

65)     Paragraph 65 is denied.

66)     Paragraph 66 is denied.

67)     Paragraph 67 is denied.

68)     Paragraph 68 is denied.

69)     Paragraph 69 is denied.

70)     Paragraph 70 is denied.

71)     Paragraph 71 is denied.

72)     Paragraph 72 is denied.

73)     Paragraph 73 is denied.

74)     Paragraph 74 is denied.

75)     Paragraph 75 is denied.

76)     Paragraph 76 is denied.

77)     Paragraph 77 is denied.

78)     Defendant can neither admit nor deny the allegations contained in Paragraph 78.   Mistry was quite well-nourished when she married and was never malnourished.

79)     Paragraph 79 is denied.

80)     Paragraph is 80 denied.

81)     Paragraph 81 is denied.

82)     Paragraph 82 is denied.

83)     Paragraph 83 is denied.

84)     Paragraph 84 is denied.

85)     Paragraph 85 is denied.

86)     Paragraph 86 is denied.

87)     Paragraph 87 is denied.

88)     Paragraph 88 is denied.  (Mistry is now in Georgia and Defendants are in Elk City, Oklahoma).

89)     Paragraph 89 is denied.

90)     Paragraph 90 is denied.

91)     Paragraph 91 is denied.

92)     Paragraph 92 is denied.

93)     Defendants are without sufficient knowledge or information to either admit or deny the allegations contained in paragraph 93 and on that basis denies same.

94)     Paragraph 94 is denied.

95)     Paragraph 95 is denied.

96)     Paragraph 96 is denied.

97)     Paragraph 97 is denied.

98)     Paragraph 98 is denied.

99)     Paragraph 99 is denied.

100)    Paragraph 100 is denied.

101)    Paragraph 101 is denied.

102)    Paragraph 102 is denied.

103)    Paragraph 103 is admitted.

104)    Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 104 and on that basis denies same.

105)    Paragraph 105 is denied.

106)    Paragraph 106 is denied.

107)    Paragraph 107 is denied.

108)    Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 108 and on that basis denies same.

109)    Paragraph 109 is denied.

110)    Paragraph 110 is denied.

111)    Paragraph 111 is denied.

112)   Paragraph 112 is denied.

113)   Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 113 and on that basis denies same.

114)   Paragraph 114 is denied.

115)   Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 115 and on that basis denies same.

116)   Paragraph 116 is denied.

117)   Paragraph 117 is denied.

118)   Paragraph 118 is denied.

119)   Paragraph 119 is denied.

120)   Paragraph 120 is denied.

121)   Paragraph 121 is denied.

122)   Paragraph 122 is denied.

123)   Paragraph 123 is denied.

124)   Paragraph 124 is denied.

125)   Paragraph 125 is denied.

126)   Paragraph 126 is denied.

127)   Paragraph 127 is denied.

128)   Paragraph 128 is denied.

129)   Paragraph 129 is denied.

130)   Paragraph 130 is denied.

131) Paragraph 131 is admitted in part. Himansu initiated the phone call to Mistry. Mistry verbally abused Himansu because Himansu informed Mistry that he told Mistry's brother the reasons Himansu was divorcing Mistry. Then, Himansu conference called in Chandrakant who was located in Oklahoma. Mistry was using profane words against Himansu at which point Chandrakant told him to terminate the call. The remaining allegations contained in paragraph 131 are denied.

132) Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 132 and on that basis denies the same.

133) Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 133 and on that basis denies same.

134) Paragraph 134 is admitted.

135) Paragraph 135 is denied

136) Paragraph 136 is denied.

137) Paragraph 137 is denied.

138) Paragraph 138 is denied.

139) Paragraph 139 is denied.

140) Paragraph 140 is denied.

141) Paragraph 141 is denied.

142) Paragraph 142 requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 142.

143) Paragraph 143 is a conclusion of law and requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 143.

144)    Paragraph 144 is denied.

145)    Paragraph 145 is denied.

146)    Paragraph 146 is denied.

147)    Paragraph 147 is denied.

148)    Paragraph 148 is denied.

149)    Paragraph 149 is denied.

150)    Paragraph 150 requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 150.

151)    Paragraph 151 is a conclusion of law and requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 151.

152)    Paragraph 152 is denied.

153)    Paragraph 153 is denied.

154)    Paragraph 154 is denied.

155)    Paragraph 155 is denied.

156)    Paragraph 156 requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 156.

157)    Paragraph 157 is denied.

158)    Paragraph 158 is denied.

159)    Paragraph 159 is a definition and requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 159.

160)    Paragraph 160 is denied.

161)    Paragraph 161 is denied.

162)   Paragraph 162 is denied.

163)   Paragraph 163 requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 163.

164)   Paragraph 164 is denied.

165)   Paragraph 165 is denied.

166)   Paragraph 166 is a definition and requires no affirmative response but to the extent a response is deemed necessary Defendants deny paragraph 166.

167)   Paragraph 167 is denied.

168)   Paragraph 168 is denied.

169)   Paragraph 169 is denied.

170)   Paragraph 170 is denied.

## AFFIRMATIVE DEFENSES

171)   Defendants state the following affirmative defenses:

a) Failure to state a claim for which relief can be granted;

b)   Lack of supplemental jurisdiction over the state law claims once the federal question claims are dismissed;

c)   Trafficking Victims Protection Act of 2003 (18 U.S.C §§1590,1589) and Alien's Tort Act (28 U.S.C. §1350) completely preempt Oklahoma Human Trafficking Act. (21 Okla. Stat. Tit. 748.2);

d) Lack of a federal criminal conviction under 18 U.C.A. §1589 or 18 U.S.C. §1590 with respect to Mistry's first and second claim for relief;

e) Mistry's Complaint fails to allege the existence or status of any federal criminal investigation or prosecution pursuant to 18 U.S.C. §1595 (b)(1);

f) The court lacks jurisdiction over Mistry's fourth and fifth claims brought pursuant to 28 U.C.A. §1350 because the allegations supporting her claims occurred in the United States, not abroad (*Velez v. Sanchez,* 754 F. Supp.2d 488 (E.D.N.Y 2010) (Split of authority on this issue, See *Magnifico v. Villanueva*, 783 F.Supp. 2d 1217 (S.D. FL 2011);

g) Trafficking Victims Protection Act of 2003 is the exclusive remedy for human trafficking and forced labor claims (*Enahoro v. Abubakar,* 408 F.3d 877, 885 (7th Cir. 2005) (Split of authority on this issue, See *Aldana v. Del Monte Fresh Produce, Inc.,* 416 F.3d 1242, 1250 (11th Cir. 2005);

h)  Waiver;

i)  Consent;

j)  Estoppel/Judicial Estoppel;

k) Unclean Hands;

l) Acquiescence;

m) Statute of Limitations with respect to some of Mistry's claims;

n)  Failure to join Necessary and Indispensable Parties (Fed. R. Civ. P. 19 (a)), (Fed. R. Civ. P. 20);

o)  Failure to exhaust adequate and available remedies in the place in which the conduct giving rise to the claim occurred with respect to Mistry's fourth and fifth claims for relief (28 U.S.C. §1350 et. seq.);

p) Fraud;

q) Issue preclusion/res judicata with respect to all claims Mistry could have brought related to or arising out of her marriage to Himansu, and

r) Misjoinder.

## COUNTERCLAIM

### Jurisdiction

This court lacks diversity and federal question jurisdiction over Mistry's claims. However, to the extent  the court finds jurisdiction to exist,  Defendants allege that this Counterclaim arises out of the same case or controversy as alleged in Plaintiff's Complaint and therefore, this court has supplemental jurisdiction over Defendants' Counterclaim pursuant to 28 U.S.C. §1367 (a).

### Factual Background

*Himansu and Mistry Meet and Announce Their Engagement*

172)   Defendants re-allege the material allegations as set forth above and further allege and state:

173)   On or about January 9th, 2007 Mistry's father ("Suresh") freely and voluntarily, along with a friend ("Raman"), came to Chandrakant's apartment in Navsari

and delivered to him and Himansu a photograph of Mistry and her bio data.  Raman was there to vouch for Suresh because Raman is a relative of Chandrakant's uncle.

174)   Himansu reviewed Mistry's photo and bio data and he made the decision to meet with Mistry.  Prior arrangements had to be made for the meeting because at that time Mistry was allegedly attending school in Rajkot.

175)   Mistry took a bus ride from Rajkot to Navsari two days later and arrived in Narsavi on January 12, 2007.

176)   Mistry and Himansu freely and voluntarily met at her uncle's home for the first date which consisted of the two speaking with one another over tea, sprite, and cookies.  Both families were in the background.  During this date Mistry represented to Himansu she was in her third and final year at a hotel and restaurant college.  Suresh represented the same facts regarding Mistry's education to Chandrakant.  Both Mistry and Suresh were not being truthful regarding Mistry's education.  This is first of many lies that would surface during the term of Himansu and Mistry's marriage.

177)   After the initial meeting Himansu decided he would like another date with Mistry.  That very same day the two met for another date which lasted about an hour.  The second date occurred at same place at the first date.  The two spoke in private while both their families waited and spoke in the next room.

178)   At the conclusion of the next meeting Himansu and Mistry announced to their families they wanted to proceed with the engagement.

179)   From January 10, 2007 up until the time of the wedding Himansu and Mistry spoke every day, "texted", emailed, and met in person.  Himansu met Mistry's

friends and even went out to socialize with them.  Mistry, as most brides do, bragged to her friends about how great her Canadian fiancé was.

180)   A "Gathering" (what Americans refer to as an engagement party) was scheduled January 24, 2007.  Himansu, Mistry and their families.

### Himansu and Mistry Get Married

181)   Himansu and Mistry were married on February 3, 2007.  (See attached marriage license labeled Exhibit 1).

182)   Chandrakant and Nilam's extended family came from as far as Canada to attend the wedding.

183)   Chandrakant and Nilam, as is expected in Indian Culture, gave Mistry a wedding gift and five wedding dresses.  The wedding gift consisted of gold jewelry worth approximately four thousand dollars ($4,000.00).  The wedding dresses cost approximately two thousand dollars ($2,000.00).

184)   The wedding was a grand celebration.  Traditional Indian rituals were followed.  The bride, groom and families enjoyed food, drink, and dance for hours.

185)   The next day, Himansu and Mistry traveled unaccompanied to Goa, a tropical beach resort in India, for their honeymoon.

### The Families are Introduced to the Newlyweds

186)   Upon return from Goa, Chandrakant and Nilam asked Himansu and Mistry if they would like to be introduced to each other's family members.  Much like in American culture, Indian tradition is that proud parents introduce their new daughter or son-in-law to the family.

187)    The meeting of the families took about three days, spread out over a two week period.  At no time was anyone forced to travel and meet family.   They traveled to Udwada, Pardi and Valsad to meet family.   In Himansu's situation, he had never met many of his family members because he was born and lived in Canada and the United States, so it was even more important that Chandrakant and Nilam went along to make the introductions.

188)    Mistry's parents accompanied Himansu, Mistry, Chandrakant, Nilam and Prasad on some of the introductions and specifically to meet Chandrakant's cousin in Udwada.

*Mistry's Visa*

189)    Contrary to Mistry's allegations, her visa process started *after* the wedding occurred on February 3, 2007.  Suresh, along with his agent friend, helped Mistry with her Visa by handling the paperwork. The agent paid the Visa application fee on February 19, 2007.  (See attached Visa application receipt for Mistry dated February 19, 2007 labeled as Exhibit 2).  It would be impossible to start a Visa application without first knowing the subject of the Visa.

190)    Three days later, on February 22, 2007, Mistry completed and executed a Visa Application for an H-4 Visa.  (See attached Visa application labeled as Exhibit 3).  Interestingly, online 21, she lists her occupation as "housewife", not student.   Also of interest, online 28 it states Mistry only intends to stay in the United States for nineteen (19) months.

21

191)   The type of Visa Mistry received only allowed her to live in the United States, not work.  Mistry was well aware of this.

*Mistry's First Lie is Discovered*

192)   During Himansu and Mistry's first date on January 10, 2007, both Himansu and Chandrakant requested copies of her education certificate showing she was in her third year of school.  Suresh and Mistry both replied that they could not get copies of the certificate until she graduated, which was completely false.

193)   At no time did either Suresh or Mistry insist that Mistry be allowed to complete her education prior to leaving for the United States.  The only conditions both Suresh and Mistry were insistent about was to set the engagement and wedding as quickly as possible.

194)   When Mistry was packing her bags to leave for the United States on or about April 2, 2007, it became clear why speed was important to Suresh and Mistry.

195)   While Himansu was helping Mistry pack her bags at Suresh's home, Mistry's education certificate fell out of the cupboard.  Himansu picked up the file. Suresh and Mistry turned white!  The education certificate showed Mistry had failed her second year of school and was classified as "ATKT," meaning Allowed to Keep Term. Mistry could stay in school and continue third year lectures but could not sit for 3rd year exams until she passed all her second failed second year courses.

196)   Mistry arrived in Elk City, Oklahoma, on about April 3, 2007.  She walked into a modest, but modern 2,200 square foot home, with the usual conveniences available

at her disposal, without restriction.  In fact, she and her husband had their own bedroom and bathroom.

197)   Himansu and Mistry's bedroom was on the other side of the house from Nilam, Chandrakant, and Prasad.  (See attached hand written floor plan of the house labeled as Exhibit 4).

198)   Himansu and Mistry's bedroom had an attached family room they utilized.

199)   Mistry's day started when she pleased, usually around 8:30 a.m.  By this point Chandrakant was on his way to work in Oklahoma City as an accountant.  Nilam was up and Himansu was already working remotely from home for a company in Georgia called NTA, Inc. d/b/a Country Inn and Suites.  About once a month, Himansu would travel to the office in Georgia.

200)   Mistry would eat breakfast with Nilam and/or Himansu which consisted of tea, cookies and cereal.  As a result of breakfast, maybe three dishes were dirtied.  Mistry would help Nilam clear and clean the three dishes.  Also, Mistry would tidy the room she and Himansu shared.

201)   Lunch and dinner had slightly more preparation and cleanup, but Mistry made the decision to help Nilam.  Further, Chandrakant did not eat lunch during the week days at the house.  He was in Oklahoma City.  Prasad, a college student, ate lunch at Southwestern Oklahoma State University in Weatherford, Oklahoma.  Finally, Himansu moved to Georgia in May, 2007, leaving only Nilam and Mistry for breakfast and lunch five days out of the week.

202)   Mistry did very little cleaning around the home.  In fact, each day she spent less than an hour helping Nilam prepare meals for the two of them and tidying up her own room.

203)   Himansu shared the marital income with Mistry.   Mistry received approximately one hundred dollars in cash from Himansu every two weeks from April to May, 2007.  In addition, Himansu or Defendants would pay for any personal items she needed.

204)   In the majority of approximately six hundred (600) family photos taken from April 2007 to January 2007, Mistry is wearing typical American clothes.  In only one set of the photos Mistry is freely and voluntarily wearing traditional Indian clothes, which was at a wedding in Russellville, AR.

205)   Mistry played, cuddled and walked the family dog, Shadow.  However, Mistry did not feed Shadow.  Shadow would only eat if Nilam fed her.

206)   The Udwadias went out to eat about once a week.  They, including Mistry, enjoyed eating at El Charro and Lupe's in Elk City.  They would also eat at Alfredo's in Weatherford and Zio's and Gopuram in Oklahoma City.  Mistry decided what dish she would order and how much of it to eat.

207)   Himansu did offer some advice to his wife regarding food in the United States.  He warned that a lot of the food contained preservatives, hormones, and other additives not found in the Indian fare she was used to eating.  Also, Himansu is very conscientious about what he eats.  Mistry did lose a small amount of weight while in the

United States, but she was healthy as is obvious in photos taken of her from April 2007 to January 2008.  She did not weigh ninety-five pounds when she left for India.

*The Alarm System in the Elk City Home*

208)   The house has three security pads that control the alarm system.  One of the three pads is outside of Himansu and Mistry's room.  No one pad is different from the other.  It is impossible to determine who enters the code from an examination of the security pads.

209)   The alarm system was monitored by Security Services since 2004.  The alarm system does not have any surveillance equipment either inside or outside the home. (See attached letter from Security Services labeled as Exhibit 5).  The alarm will go off when a door is opened while the system is activated if the code is not entered within a very short time.  Also, a chime will sound when the alarm is not activated and an exterior door is opened.

210)   Each member of the Udwadia family, including Mistry, had the **CODE** to the alarm.

*Mistry's Passport, Wedding Jewelry, and Wedding Dresses (Sarees)*

211)   In Indian, the wedding gift, or Mangalsutra, is of particular importance. Historically, cows were given to newlyweds so in the event of hard times the cow's milk would sustain the family.  The modern gift of jewelry has the same purpose.  In the event the family encounters financial difficulty the jewelry could be sold.  Otherwise, the wedding jewelry is customarily buried with the wife.

212)   In addition, in Indian culture, a person's karma attaches to his or her personal possessions.  Stealing a person's possession means taking that person's karma, good or bad.  This is why used clothing stores are not found in India.

213)   Mistry had possession and control at all times of her valuables, including her passport.

*Mistry's Communication with the Outside World and a Pattern of Deceit From*
*April 3, 2007 to November 15, 2007*

214)   The Elk City home had cable, internet, and phone.  The phone package included unlimited calls to India.  Mistry had access to computers with internet at the house.  She used to speak with her parents at least once a week.  She used the laptop to email and chat with friends and family. She routinely spoke on the telephone with friends.

215)   A good portion of Mistry's day in Elk City from April 2007 to November 15, 2007, consisted of surfing the web, watching television, and talking on the phone.

216)   Mistry would routinely have telephone calls with men who Himansu did not know.  Mistry would insist to speak with these men outside of ear shot of Himansu or anyone else.

217)   People would call the Elk City home at all hours of the night (midnight to 3:00a.m.) and if Mistry did not answer the phone, the caller would hang up.

*Himansu Moves to Georgia and Mistry Voluntarily Stays Behind for Financial*
*Reasons*

218)   Himansu, a 25 year old man, was looking for opportunities to advance his accounting career.  An opportunity arose in Douglasville, Georgia, to work for a C.P.A.

Himansu applied and got the job.  This promotion for him was big because working for a C.P.A. as an accountant is more prestigious and pays better than working for a hotel chain.

219)   However, the new job had a probationary period with a tiered pay scale. (See attached letter from Jeetesh D. Mistry, CPA, PC, labeled as Exhibit 6).  Himansu would only make minimum wage when he first started on June 1, 2007.  By November, 2007, Himansu was earning $36,000.00 per year or $3,000.00 per month.  Mistry moved to Georgia on or about November 15, 2007.  Chandrakant, Nilam, and Prasad drove her to Georgia and helped her move in.

220)   Because of the tiered pay structure Himansu asked his father for help getting started in Georgia.  Chandrakant called his friend in Jonesboro, Georgia, and asked if Himansu could live with him while he got on his feet financially.  The friend agreed.  However, this friend, his wife, and two children lived in a modest four bedroom, two and-a-half bathroom home.

221)   Himansu and Mistry talked about him moving to Georgia without her at the beginning and moving her out to Georgia later when he could afford it.  Mistry had no objection to remaining in Elk City with Chandrakant, Nilam and Prasad.

222)   During the time Himansu lived in Georgia, Himansu and Mistry saw each other about once a month.

*The Engagement Party in Canada*

223)   Chandrakant and Nilam wanted to introduce the newlyweds to family and friends in Canada that could not attend the wedding in India.

224)   On or about April 28, 2007 Chandrakant, Nilam, Himansu, Mistry, and Prasad left Elk City, Oklahoma and begin their trip to Canada for the wedding reception. They drove to Cleveland, Ohio and stayed with friends.

225)   On the way to Cleveland Mistry first complained of a toothache.   Himansu and Chandrakant immediately found a dentist to see Mistry.   Himansu and Chandrakant stayed in the waiting area while the dentist examined Mistry.   The dentist recommended the tooth be pulled.   Chandrakant paid for the procedure.

226)   The next day, the Udwadia Family left Cleveland and drove to Detroit Michigan.

227)   Mistry needed to obtain a Canadian Visa from the Canadian Embassy to enter Canada.   The rest of the Udwadias were Canadian citizens and did not need Canadian Visas.

228)   Upon information and belief, during Mistry's Visa interview with the Canadian official she said something that caused the official to decline her Visa (See attached letter from the Canadian Government Official labeled as Exhibit 7, page 2) and cited  Regulation 179 which stated:

> You have not satisfied me that you meet the requirements of Regulation 179; that you would leave Canada at the end of the temporary period if you were authorized to stay.   In reaching this decision I considered your ties to your country of residence/citizenship balanced against factors which might motivate you to stay in the Canada.

The Canadian government denying Mistry a Canadian Visa had nothing to do with Himansu's U.S. Visa.

229)    Consequently, the wedding reception was cancelled.   Chandrakant checked Nilam, Himansu, Mistry, and Prasad into a hotel suite with two double beds and a couch in Niagara Falls.   Chandrakant immediately left for Canada to inform family members of what happened and cancel reservations and attempted to secure refunds.

230)    Nilam, Himansu, Mistry, and Prasad stayed in the Niagara Falls hotel for three to five days while Chandrakant took care of the issues arising from the cancellation of the wedding reception.   Nilam slept in one bed, Himansu and Mistry slept in another bed, and Prasad slept on the couch so he could play video games all night.

*Trips the Udwadia's took from April 2007 to November 2007*

231)    On June 28, 2007 to July 5, 2007, Chandrakant, Nilam, Mistry, and Prasad visited Himansu in Jonesboro, Georgia, to celebrate Chandrakant and Nilam's wedding anniversary and enjoy the long weekend.

232)    In July 2010, Himansu travels by car to Elk City, Oklahoma, from Jonesboro, Georgia to attend a party Chandrakant and Nilam arranged at their home. They invited about 40 people to come to their home for a celebration.

233)    August 2-4, 2007, Chandrakant, Nilam, and Prasad drove to Russellville, Arkansas from Elk City, Oklahoma, for a wedding.   Himansu drove from Jonesboro, Georgia, to Russellville, Arkansas, and arrived on August 3, 2007.   The evening of August 2, 2007, Mistry stayed *alone* in her own hotel room. Chandrakant, Nilam, and Prasad had another hotel room.   The hotel was owned by a friend of Chandrakant and he did not charge the Udwadias for the rooms.   Himansu arrived on August 3, 2007 and stayed in the room with Mistry.

29

234)   On August 31, 2007, Chandrakant, Nilam, Mistry, and Prasad travel to Jonesboro, Georgia, to visit Himansu.

235)   On November 15, 2007, Chandrakant, Nilam, Prasad and Mistry travel to Douglasville, Georgia, to move Mistry into the apartment with Himansu.

### Himansu and Mistry's Life in Douglasville, Georgia

236)   The newlyweds rented a one bedroom apartment in Douglasville, Georgia, on or about November 15, 2007.  The apartment had internet, phone, and cable.

237)   Himansu would wake at 6:30 a.m. each work day and arrive at work by 8:00 a.m.  Sometimes Himansu would come home for lunch, sometimes he would not.

238)   Mistry was alone all day.  The apartment was in an urban area surrounded by retail shops and businesses.  Further, she had money.  Himansu would share the marital funds earned from his job with Mistry.

239)   Himansu and Mistry would go see movies, have dinner with friends, clients, and even Himansu's boss.

240)   However, Mistry was bored sitting around the apartment all day and seemed to have little interest in performing work a typical housewife would do.

241)   Therefore, she enrolled in an online accounting course without any encouragement from Chandrakant, Nilam, or Himansu.  Further, Chandrakant had not even set up his accounting business when Mistry made the decision to enroll in the course.  Chandrakant's company was incorporated on November 5, 2008.  (See Exhibit 8).

242)   Mistry enjoyed engaging in clandestine telephone calls with men.  This was a problem.  This problem continued and followed them from Elk City, Oklahoma to Douglasville, Georgia. Himansu objected; the calls continued.

243)   Then, in late January, 2008, Mistry insisted on going down to the local Dairy Queen to try to convince the owner to hire her.  Himansu went with her.  Himansu was very concerned that Mistry working illegally in the United States would jeopardize her Visa.  He tried to talk Mistry out of working but she insisted, saying she was bored. Chandrakant had nothing do with Mistry getting a job at the Dairy Queen in Georgia. Chandrakant was living and physically present in Elk City, Oklahoma, at the time Mistry got the job.

244)   Mistry worked at the Dairy Queen and became smitten with the owner's son.  She tried to arrange her schedule to coincide with the owner's son's schedule.

245)   Himansu and Mistry were finding out they were not right for one another. The couple started fighting constantly.  Himansu would often sleep on the couch in February 2008.  The end was near and both Himansu and Mistry knew it.

*The End*

246)   Chandrakant, Nilam, and Prasad planned a visit to see Mistry and Himansu in March 2008.

247)   On the second day of Defendants visit in March 2008, Himansu told them he intended to divorce Mistry.  Himansu explained his reasons to Chandrakant and Nilam and they of course offered their support.

248)   Shortly thereafter, Himansu told Mistry he wanted a divorce.    Mistry accepted that the marriage was over.   Himansu purchased a plane ticket for her to return to India.

249)   Mistry's major concern was not the end of her marriage but Himansu not telling her father the reasons for the marriage ending.

250)   A day or two later, Mistry packed her bags while Defendants, Himansu and Prasad assisted.   Mistry's wedding jewelry, personal effects, and wedding dresses were all packed in her suit case.

251)   Defendants, Himansu and Prasad drove Mistry to the airport in Atlanta, Georgia.   Nilam gave Mistry a thousand dollars ($1,000.00) and wished she would find happiness with another man.

252)   Himansu called Suresh, Mistry's father, and informed him Mistry was on her way back to India and the reasons why the marriage did not work out. Prior to Mistry departing she insisted Himansu not call her father the reason for the divorce because she wanted to pick the right moment to tell him.

253)   Once Mistry arrived in India Himansu called Mistry to ensure her safe arrival.  Himansu also spoke with Mistry's father.

254)   A few days later, Mistry called Himansu wanting to reconcile the marriage. When it was clear to Misty that Himansu had no interest in continuing the marriage Mistry started rambling and being verbally abusive calling him names such as stupid, crazy, and asshole.   At this point Himansu conference called Chandrakant on the telephone who, after speaking with Mistry briefly, recommended that Himansu hang up.

255)   Upon information and belief Himansu never spoke with Mistry again. Mistry did not attempt to communicate with Himansu by email or any other method.  In fact, Himansu didn't even know Mistry came back to the United States.

256)   Mistry's family lost track of her.  (See attached affidavit from Mistry's father labeled as Exhibit 9).

257)   The next time the Udwadia family heard from Mistry was through a letter from Mistry's counsel dated May 13, 2011.

*The Stigma of Divorce in India Has Changed In Urban Areas*

258)   Plaintiff claims that Defendants used the "societal stigma in India associated with divorce to their advantage and routinely threatened to have Himansu divorce [Plaintiff] and send her back to India if she did not do what she was told."  First, Defendants never made any such threats to Plaintiff.

259)   Second, divorce is no longer viewed as unacceptable in India.  Although family courts persuade couples to work their problems out, divorce is an option for couples in India.  Muneeza Naqvi, *Divorce Rates Rise as Taboo Falls in Urban India*, India-West, April 22, 2011, at A40.  (See Attached Exhibit 10).

260)   It is no longer the case that parents cannot find suitable matches for divorced children and increasingly "families feel that there isn't enough dishonor if your daughter is being mistreated." *Id.*  Divorce rates have risen in India because it is no longer a taboo subject; thus, the stigma Plaintiff contends that is associated with divorce in India is not an issue. *Id.* There is no better proof of this contention than the fact that Mistry is remarried.

### *Mistry Makes Allegations that Chandrakant Controlled Matters Over Which he Would have no Control*

261)   Mistry alleges that somehow Chandrakant and Nilam cancelled Mistry's cell phone subscription and email accounts she had prior to meeting Himansu.  (See Complaint, ¶17).

262)   Mistry alleges that somehow Chandrakant overpowered the professional judgment of a dentist regarding the amount of medicine needed to numb her tooth.  (See Complaint, ¶84).

263)   Mistry alleges that somehow Chandrakant overpowered a medical doctor who asked him to leave the examination room during one of Mistry's alleged appointments.  (See Complaint, ¶81).

264)   Mistry's alleges Chandrakant somehow would control how the hair dresser cut Mistry's hair.  (See Complaint, ¶56).

265)   Last and certainly not least, Mistry alleges that Chandrakant and Nilam, located a half a continent away in Elk City, Oklahoma, somehow controlled her daily activities in Douglasville, Georgia.  Mistry further alleges that Defendants could control her ability to simply walk out the apartment door and ask the apartment manager, next door neighbor, mailman, maintenance person, co-worker at Dairy Queen, or one of the other thousands of people in her immediately vicinity for help.

266)   Simply put, common sense would tell a person her allegations regarding the above are highly suspect.

### COUNT ONE-ABUSE OF PROCESS

267)     Defendants incorporate by referenced all the foregoing allegations and further allege and state:

268)     Under Oklahoma law the elements of an abuse of process are (a) the improper use of the court's process, (2) primarily for an ulterior motive or improper purpose, and (3) with resulting damage to Plaintiff asserting the misuse. *Callaway v. Parkwood Village, LLC*, 1 P.3d 1003, 1004 (Okla. 2000).  The key issue in any abuse of process claim is whether a party has attempted to use the legal system to "obtain a result not lawfully warranted or properly attainable."  *Neil v. Pennsylvania Life Ins. Co.,* 474 P.2d 961, 965 (Okla. 1970).

269)     Plaintiff has engaged in conduct designed to allow her to remain in the United States and seek to extort money from Defendants,  and to harm Defendant's reputation.  By making the allegations and filing this lawsuit, Plaintiff has continues to enjoy refugee status and continues to reside in the United States.

270)     Upon information and belief Plaintiff has also filed this lawsuit for the purpose of blaming Defendants for the failure of her marriage.

271)     Plaintiff's acts constitute an awful abuse of process.  As a consequence of these acts, Defendants have been forced to defend a lawsuit that has no basis, suffered harm to their reputation as well as emotional pain, anguish, humiliation and embarrassment.

272)     As further evidence of Mistry's abuse of process she fails to include

her then husband, Himansu, as a named or unnamed conspirator in allege trafficking and forced labor.  For a claim of human trafficking or forced labor of this nature involving spouses to have any legitimacy the spouse of alleged trafficked spouse had to be involved.  The reason for this omission is simple, Defendants never trafficked anyone, never forced anyone into involuntary servitude, never conspired with anyone to perform an illegal.  Mistry has no case.

273)     Defendants pray for actual damages in excess of  $75,0000.00 and punitive damages to be determined by a jury, plus costs, expenses and attorneys fees.

274)                    **PRAYER FOR RELIEF**

WHEREFORE, Defendants, Chandrakant and Nilam Udwadia, respectfully pray for Judgment as follows:

a) Judgment in their favor and against Plaintiff Diptiben Mistry on Claims for Relief One through five in Mistry's Complaint;

b) Judgment in their favor and against Plaintiff Diptiben Mistry on Count One of Defendants' Counter Claim,

c)  All recoverable compensatory, punitive, and other damages sustained by Defendants;

d)  Appropriate equitable relief as may be allowable under applicable law;

e) For Defendants reasonable attorney's fees, costs and expenses incurred and for such further relief as the Court deems just and equitable.

Respectfully submitted,

/s/ Peter L. Scimeca
W. David Pardue, OBA No. 6886
Peter L. Scimeca, OBA No. 21805
Chelsea C. Smith, OBA No. 30728
ANDREWS DAVIS
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELLORS AT LAW
100 North Broadway, Suite 3300
Oklahoma City, Oklahoma  73102
Telephone:  405/272-9241
Facsimile:  405/235-8786
Email: dpardue@andrewsdavis.com
Email: plscimeca@andrewasdavis.com
Email: ccsmith@andrewsdavis.com
ATTORNEYS FOR DEFENDANTS

JURY TRIAL DEMANDED

ATTORNEY'S LIEN CLAIMED

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of March, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Amy Sherry Fischer, Esq.
Allison Lafrak, Esq.
Lynsay Gott, Esq.

s/ Peter L. Scimeca
Peter L. Scimeca